## HAROLD TURNER v. NORTHERN PACIFIC RAILWAY COMPANY.[1]

February 16, 1940.

No. 32,298.

[1]Reported in 290 N. W. 563.

*S. Bernhard Wennerberg* and *Samuel A. Anderson,* for appellant.

*L. B. da Ponte, Frederic D. McCarthy, F. W. Root, C. O. Newcomb,* and *A. C. Erdall,* for respondent.

GALLAGHER, CHIEF JUSTICE.

Plaintiff appeals from an order granting defendant's motion for judgment *non obstante* after a verdict in his favor.

Defendant operates a line of railroad between St. Paul and Duluth in this state and into and through a number of other states. The line involved in this case passes through Rush City, Harris, and North Branch and is equipped with what is known in railroad parlance as a block signal system. Rush City is located about 98 miles south of Duluth, Harris is seven miles south of Rush City, and North Branch is five miles south of Harris.

At the time in question and for some years before, decedent, Oscar F. Turner, was engaged as a section foreman for defendant and lived in North Branch. Shortly before three o'clock a. m. on the morning of February 7, 1938, Turner was notified by a signal maintainer for defendant company to go to a point a short distance north of Harris and replace a broken rail which was detected through the operation of the signal system. Decedent, with two helpers, met at the depot in North Branch about three

o'clock a. m. and proceeded to get a gasoline motorcar and trailer ready for the trip. While they were doing so a southbound freight train identified as No. 627 went through North Branch. Shortly thereafter Turner telephoned the train dispatcher at Duluth for a train line-up. We quote from the dispatcher's testimony which gives his version of the conversation:

Q. "Tell us now just what the conversation was between Turner—that is the section foreman, isn't it, at North Branch at that time?

A. "Yes, sir.

Q. "And yourself.

A. "Turner came in on the phone and in the usual manner called the dispatcher. 'North Branch,' he says. 'This is the section foreman, North Branch.' I says, 'Yes.' 'What trains are coming? I want to get a line-up.' I took my line-up book down to make a record of it and asked him or told him—pardon me—that No. 627 had left Rush City at 2:15. I said, 'Have you seen anything of them?' He said, 'A train passed here just a few minutes ago going south with two hot boxes.' I said, 'Well, that is the only train in there, that 627 that has passed you.'

Q. "What is that?

A. "That 627 has passed you.

Q. "Has passed you—

A. "Yes. He said the train had gone by. I said, 'Now, let me ring Rush City and see where 625 is.' And he said, 'All right.' He was on the phone. Then I secured the report from Rush City of the train having passed. I said: 'North Branch, did you hear that?' He replied, 'Yes.' Then I continued and gave him a report of other trains.

Q. "What did you tell him about 625?

A. "No. 625 left Rush City at 3:15 a. m. No. 65 would get out of Rush City about 4:05 or 4:10. We will call them about on time. Extra C. M. St. P. Eighty-Three Ninety-Two east—that is the Milwaukee—will leave White Bear on the arrival of 65.

North Branch about 6:30 a. m. I repeated those trains to Turner, and he repeated my conversation to me.

Q. "What else did you say to him and he say to you?

A. "Well, after I reported 625 leaving Rush City at 3:15 I said: 'You will have to stay at North Branch for No. 625.' He said, 'Yes.' I said, 'Then possibly you may be able to go to Harris for 65.' He said, 'All right. Stay at North Branch for 625.' And I said, 'Yes. And you may possibly go to Harris for No. 65.' He said, 'That will be all right. I pick up my rail at Harris.' I said, 'All right.' And I mentioned to Turner at least twice and possibly three times about 625—staying there."

He claimed to have made a report known as "Foreman's Train Location" at the time of the conversation. This report, defendant's exhibit 6, was received in evidence and contains among other things these notations:

"No. 627 left Rush City 2:15 a. m.

"No. 625 left Rush City 3:15 a. m.

"No. 65 abt O. T." (meaning about on time)

The dispatcher was further corroborated by the testimony of an assistant chief dispatcher, who was in the office at Duluth at the time of the conversation and claimed to have heard what was said by the aid of a loud speaker located in the office. He was also corroborated by the testimony of an operator at White Bear Lake, who testified that he took down the receiver of his telephone about 3:15 a. m. on the morning in question for the purpose of furnishing a weather report to the dispatcher and that he overheard the conversation between the dispatcher and Turner. Defendant also offered in evidence a copy of Turner's report made on a sheet similar to the one used by the dispatcher (defendant's exhibit 6). There is some discrepancy between the data contained on the two reports. On Turner's report (defendant's exhibit 5), among other things, we find these two notations:

"60   75   3:15

"65 out of Rush City 4:10."

The figures "3:15" correspond with the time the dispatcher claims to have notified Turner that No. 625, the train involved in the accident, was out of Rush City, and Turner's notation pertaining to No. 65 corresponds quite closely to the dispatcher's notation, but no one seemed to be able to ascertain the meaning of the figures "60 and 75" contained on decedent's report.

In the depot with Turner at the time of the conversation was one Peterson, a helper, who aided decedent in writing the report. Peterson did not testify as to what he heard Turner say nor was he very closely pressed on the question by counsel for either side. He did testify, however, that immediately following the conversation between the dispatcher and Turner, the latter said, "Let's go," and that the three men thereupon put the motorcar on the track and started for Harris, where they were to pick up a rail to replace the broken one. As they reached a point about one mile south of Harris they observed a red light on the semaphore of the signal system. About the same time, through a heavy fog, they observed the headlight of an engine, which proved to be the engine pulling train No. 625 approaching from the north. The motorcar was stopped. Turner jumped off and ran north along the west side of the track giving stop signals with his lantern. The engineer testified that he saw a man running along the west side of the track waving a light and promptly applied the emergency brakes. The train thereafter ran about 800 feet before it came to a stop. Turner's body was later found in a ditch about 15 feet west of the track and 90 feet north of the place where he left the motorcar. The helpers, being unable to get the motorcar off the track, abandoned it and were not injured although the train struck the motorcar. They lost sight of Turner and did not see what happened to him. It is quite likely that he was struck by the pilot beam of the engine, which was its widest part.

In his complaint plaintiff charged defendant with negligence in two respects: First, in its failure to give to decedent a proper train line-up or to warn him of the presence of train No. 625 on the track over which he was to travel; and, second, because of its

failure to warn the train crew of the presence of Turner and his helpers on the line at the time and place in question. Claim of negligence on the last ground appears to have been abandoned in this court.

The jury returned a verdict for plaintiff in the sum of $12,575, which the trial court set aside by its order granting judgment notwithstanding the verdict. In his memorandum accompanying the order, the trial court assigned as reasons for his action: (1) That the decedent assumed the risk; (2) that the evidence disclosed no act of negligence on the part of the defendant that was the proximate cause of decedent's death; and (3) that decedent had violated a definite order of defendant company and that such disobedience was the sole cause of the accident.

We do not deem it necessary to analyze to any great extent the evidence pertaining to plaintiff's only claim of negligence, that is, that defendant was negligent in failing to give decedent a proper line-up of trains and in failing to warn plaintiff that train No. 625 was traveling on the track over which he and his helpers were to operate the motorcar. As we view the case, giving to plaintiff's testimony all of the weight which he contends it deserves and conceding for the purposes of this decision only that there was sufficient evidence to make a jury issue on the question of defendant's negligence in the respect claimed, we nevertheless believe that plaintiff has fallen short of proving any act of negligence on defendant's part which in a legal sense contributed to decedent's death. Plaintiff's rights and defendant's responsibilities hinge not on what defendant did or failed to do with reference to warning decedent before he left North Branch for Harris, but rather on the conduct of decedent and defendant after decedent arrived at the place where he discovered his jeopardy and had an opportunity to preserve himself from harm. The testimony is clear that after discovering the approaching train Turner traveled at least 90 feet on foot along the track toward the train. The only motive we can find in the record for attempting to flag the train was to prevent it from running into

the motorcar upon which the men had been riding. There was ample time for them to leave the car and acquire positions of safety; in fact, the helpers did this very thing. There is no claim that decedent was attempting to flag the train because of the broken rail, as the train had already passed over the place where the broken rail was located as had train No. 627 before it. No act of negligence occurred on defendant's part between the time decedent discovered his plight and the time when he was struck by the train. It is not claimed that under existing circumstances the engineer could have brought the train to a stop in sufficient time to avoid running into decedent; in fact, decedent was traveling along the west side of the track and was only a short distance from the place of the accident when he was first observed by the engineer.

It matters little whether we say that decedent's injuries and resultant death were caused solely by reason of his negligence or because he had assumed the risk of the work in which he was engaged when injured. In either event, recovery must be denied. Chesapeake & Ohio Ry. Co. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. ed. 914; Elliott v. C. M. & St. P. Ry. Co. 150 U. S. 245, 14 S. Ct. 85, 37 L. ed. 1068. There is nothing in the record to indicate that he was in a position of peril from which he did not have an opportunity to extricate himself when he discovered the approaching train. He may have stumbled and fallen against the engine, or he may have misjudged the distance he was traveling from the train. Regardless of the cause, we fail to find any act of negligence on the part of defendant or its employes, occurring after the discovery by decedent that a train was approaching, which contributed to his death.

The jury could come to but one reasonable conclusion in light of the evidence, i. e., that defendant's negligence, if any, was not a proximate cause of decedent's death. A jury case is not made out unless reasonable minds could conclude from the evidence that defendant's negligence proximately caused injury. Cain v. F. W.

& D. C. Ry. Co. (5 Cir.) 75 F. (2d) 103.   Consequently the trial court must be affirmed.

Order affirmed.

